# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D18-2782

_____

DENISE WILLIAMS,

    Petitioner,

    v.

STATE OF FLORIDA,

    Respondent.

_____

Petition for Writ of Habeas Corpus—Original Jurisdiction.

September 20, 2018

PER CURIAM.

This petition for writ of habeas corpus challenges a trial court order that denied a motion to set bond and directed Petitioner be held pending trial. We deny the petition.

Petitioner is charged with first-degree murder, a capital offense, and conspiracy to commit first-degree murder and accessory after the fact to first-degree murder, offenses which are punishable by life imprisonment. *See* § 782.04(1), Fla. Stat. Article I, section 14, of the Florida Constitution states:

Pretrial release and detention.—

Unless charged with a capital offense or an offense punishable by life imprisonment and the proof of guilt is evident or the presumption is great, every person charged with a crime or violation of municipal or county ordinance shall be entitled to pretrial release on reasonable conditions. If no conditions of release can reasonably protect the community from risk of physical harm to persons, assure the presence of the accused at trial, or assure the integrity of the judicial process, the accused may be detained.

This provision has been construed to mean that a person charged with a capital offense or an offense punishable by life imprisonment is "entitled to release on reasonable bail as a matter of right" unless "the proof is evident or the presumption great that [the accused] is guilty of the offense charged." *State v. Arthur*, 390 So. 2d 717, 718 (Fla. 1980). We find that the State has met its burden of proof under *Arthur*.

The charges against Petitioner arose from the presumed drowning death of her husband Mike Williams, who disappeared during a hunting trip on December 16, 2000. Petitioner and Williams were friends with Brian Winchester and his wife. In 2003, Winchester and his wife were divorced. In 2005, Petitioner married Winchester. Petitioner and Winchester separated in 2012, and Petitioner filed for divorce in 2015. Approximately one year after Petitioner filed for divorce, Winchester kidnapped Petitioner at gunpoint. As a result, Winchester was charged with aggravated assault with a firearm, false imprisonment, and battery. Winchester faced a potential life sentence for the crimes he committed against Petitioner.

Winchester entered into a proffer agreement whereby the State (1) agreed to not request a life sentence for his pending charges involving the crimes he committed against Petitioner, (2) agreed to not pursue a witness tampering charge, and (3) offered complete immunity for any admissions that Winchester would make regarding Williams' disappearance. Winchester told law enforcement officials that he was responsible for killing Williams and Petitioner conspired in the murder. Winchester led law enforcement officials to a remote location where Williams'

2

remains were found. Winchester was ultimately sentenced to twenty years in prison for the charges involving the crimes against Petitioner.

After her arrest, Petitioner filed a motion to set bond. The trial court held an evidentiary hearing pursuant to *Arthur*. The trial court heard evidence from Winchester that he and Petitioner began an affair in October 1997. Petitioner made it clear that she would never divorce Williams because she was concerned about how it would appear to others. In 2000, Petitioner became worried that Williams would discover the affair and seek a divorce. At some point, Petitioner and Winchester started discussing the death of their spouses. Winchester refused to consider anything happening to his first wife for the sake of their child. Petitioner said it would be nice to be with Winchester, but it would be even better if they had money. Williams had three insurance policies: a policy taken out in February 1995 for $250,000 issued by Kansas City Life Insurance Company; a policy taken out in March 2000 for $500,000 issued by Cotton States Insurance Company; and a policy taken out in April 2000, nine months prior to his death, for $1 million issued by Kansas City Life.

Winchester stated Petitioner was aware that Williams was planning to drop the $500,000 insurance policy within a few months after obtaining the $1 million policy. The potential lapse of the $500,000 insurance policy was an important factor in the timing of Williams' death. Winchester stated that he and Petitioner discussed a scenario where Winchester and Williams would go hunting and Williams would have an "accident." Petitioner and Winchester made plans so that they would have alibis for the time of Williams' disappearance. Winchester ended up shooting Williams and hiding his body. Petitioner was not aware that Williams had been shot, but she did know that the plan that day was for him never to return home.

At the *Arthur* hearing, the State submitted sworn statements from Williams' mother and brother that indicated in 2001, the mother had a picture of Williams included in a newspaper article about missing people. Petitioner was "livid" that Williams' photograph and information were included in the

3

article. Petitioner confronted Williams' mother and threatened to prevent her from seeing her granddaughter if she continued to pursue a criminal investigation. In 2005, after a criminal investigation was started, Petitioner and Winchester confronted Williams' mother again. Petitioner told her that if she stopped the investigation, she would be able to see her granddaughter again. The investigation continued, and after January 8, 2005, Petitioner did not allow Williams' mother or brother to see the granddaughter.

The State also submitted a 2005 law enforcement investigative summary. That report stated that Petitioner held a memorial service for Williams on February 11, 2001, approximately seven weeks after he went missing. On June 21, 2001, a local fisherman found a pair of waders in the area where the search for Williams had taken place. On June 23, 2001, a local diver found a yellow flashlight and a camouflage jacket. Williams' mother identified the flashlight as a gift she had given Williams around Thanksgiving 2000. His Arkansas hunting license was found in a pocket of the jacket.

Petitioner filed a death claim with Kansas City Life on January 4, 2001, only three weeks after Williams' disappearance. On that form, Petitioner failed to disclose the existence of the $1 million policy issued by Kansas City Life. On June 29, 2001, Petitioner filed a sworn petition for a presumptive death certificate which stated that Kansas City Life was the only other party with an interest in the petition. This was a false statement because Williams also had the $500,000 policy with Cotton States. The order declaring Williams presumptively dead was signed the same day the petition was filed. Petitioner did not file a death claim with Cotton States until September 19, 2001. Petitioner received a total of $1,484,453 from the life insurance policies.

Petitioner makes two arguments. First, she asserts that because Winchester was a co-conspirator, his statement cannot meet the heightened burden of *Arthur* as a matter of law. We reject that argument and hold that a co-conspirator's statement can meet the required evidentiary standard of "the proof of guilt is evident or the presumption is great." Winchester's sworn

4

statement was internally consistent and there was no evidence presented to contradict his factual allegations. *Cf. Kirkland v. Forture*, 661 So. 2d 395 (Fla. 1st DCA 1995) (holding that a defendant was entitled to pretrial release because the only evidence of the defendant's involvement in the murder was three unsworn statements: two internally inconsistent statements made by the person thought to have actually committed the murder and one from the alleged murderer's wife).

Next, Petitioner asserts that there is no physical evidence linking her to the crime as in *State v. Perry*, 605 So. 2d 94 (Fla. 3d DCA 1992), and that the State's case was based almost entirely on the testimony of an alleged accomplice. In *Perry*, there was impeachment evidence that contradicted the alleged accomplice's testimony. Here, in addition to Winchester's statement, which was internally consistent and uncontradicted, there was additional circumstantial evidence of guilt established by the sworn statements made by Williams' mother and brother, and the evidence concerning the life insurance policies. Petitioner threatened Williams' mother for seeking an investigation into her son's death. When the investigation continued, Petitioner followed through with the threat to deny Williams' mother visitation with the granddaughter. In addition, Petitioner failed to disclose the $500,000 Cotton States policy on the sworn petition for presumptive death certificate or the $1 million policy issued by Kansas City Life on the claim form filed with Cotton States.

The trial judge heard and evaluated the evidence presented. When reviewing the sufficiency of evidence presented to a trier of fact, our undertaking is not to reweigh the evidence. *See Hernandez v. State*, 56 So. 3d 752, 758 (Fla. 2010) ("When reviewing the sufficiency of evidence presented to a trier of fact, our task is not to . . . reweigh the evidence."). We find no error in the trial court's ruling.

PETITION DENIED.

WOLF, ROWE, and JAY, JJ., concur.

5

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

Michael Ufferman of the Michael Ufferman Law Firm, P.A., Tallahassee, for Petitioner.

Pamela Jo Bondi, Attorney General, and Trisha Meggs Pate, Bureau Chief, Tallahassee, for Respondent.